**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street NE**<br>**Washington, DC 20549**<br><br>                                                    **Plaintiff,**<br><br>**v.**<br><br>**ZHOU MIN NI; and**<br><br>**JIAN MING NI,**<br>**also known as**<br>**JONATHAN NI,**<br>**also known as**<br>**JIANMING NI,**<br><br>                                                    **Defendants.** | **No. 24-CV-1632**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its

Complaint against defendants Zhou Min Ni, and Jian Ming "Jonathan" Ni, alleges as follows:

<u>**SUMMARY**</u>

1.       This case is about a years-long course of fraudulent conduct by Zhou Min Ni and

Jonathan Ni, the former Chief Executive Officer (CEO) and Chief Financial Officer (CFO),

respectively, of HF Foods Group Inc. ("HF Foods") that violated the scienter-based and other

provisions of the federal securities laws.[1] From 2018 through 2021 (the "Relevant Period"),

Zhou Min Ni, with the knowing assistance of Jonathan Ni from 2018 until April 2019, concealed

the transfer of company funds to Zhou Min Ni and his family; hid millions of dollars in liabilities

using a misleading promissory note to a third-party entity with no legitimate business

---

[1] Originally named HF Group Holding Corp., HF Foods merged with Atlantic Acquisition (a public company) in August 2018. Atlantic Acquisition then changed its name to HF Foods Group Inc. This Complaint will generally refer to the company as HF Foods, but will use "HF Group" when specifically referring to the time before the company went public.

relationship with HF Foods; and made misleading statements to investors and HF Foods's auditors regarding the compensation paid to Zhou Min Ni, misrepresenting the true nature of HF Foods's relationship with a purported supplier, and omitting material facts about HF Foods's financial records and lack of internal controls that rendered the statements misleading.

2.      For many years, HF Group was a private company, co-owned by Zhou Min Ni and his spouse. During this time, Zhou Min Ni and his family made use of private company funds for personal reasons, including purchasing and maintaining a fleet of luxury and exotic sports cars. In the fall of 2017, HF Group, under the direction of Zhou Min Ni, embarked on a plan to become a public company via a merger with a special purpose acquisition company ("SPAC"). When HF Group completed the merger with the SPAC in August 2018 and became HF Foods, the infusion of capital it received brought with it a host of new rules and regulations, as well as increased scrutiny.

3.      In late 2017 and early 2018, as HF Group prepared to go public, Zhou Min Ni and Jonathan Ni were aware of and participated in a scheme to cause HF Foods to engage in certain related party transactions for the benefit of Zhou Min Ni and his family and to mislead the general public about these transactions.

4.      First, Zhou Min Ni and Jonathan Ni concealed Zhou Min Ni's use of company money on his family's fleet of luxury and exotic cars. Specifically, in 2017, at Zhou Min Ni's direction, Jonathan Ni helped set up three new private corporate entities: Revolution Industry, Revolution Automotive, and Revolution Property. Then at Zhou Min Ni's behest, Jonathan Ni helped transfer a profitable HF Group business line (the production and sale of a food mixture used in eggrolls) into Revolution Industry, a company then co-owned by Zhou Min Ni and his then-teenage son. Revolution Industry then contracted with HF Group to provide what HF Group

had formerly produced itself. Revolution Industry then forwarded a portion of the funds to Revolution Automotive, an entity owned by Zhou Min Ni's then-teenage son, who used the funds to maintain and expand a fleet of luxury vehicles. Through these corporate entities, Zhou Min Ni and Jonathan Ni transferred hundreds of thousands of company dollars to Zhou Min Ni and his family, both before and after HF Foods became a public company. In addition to payments and cash advances sent by HF Foods to Revolution Industry for the eggroll mixture, HF Foods also made at least one cash advance to Revolution Industry in August 2018 that was not tied to any specific product order (but *was* tied to Revolution Automotive expenses for luxury vehicles). Zhou Min Ni and Jonathan Ni failed to disclose a portion of these payments to Revolution Industry as compensation for the CEO by failing to record them as such in the company's public filings. They also signed public financial disclosures that misleadingly omitted the fact that certain payments to Revolution Industry were not in the ordinary course of business.

5.      Second, Zhou Min Ni and Jonathan Ni concealed an internal loan and investment program (the "Staff Loan Program"), representing millions of dollars in liabilities, by falsely recording transactions involving the program under a line of credit promissory note agreement with Feilong Trading, Inc. ("Feilong"), a purported supplier of HF Foods. In fact, Feilong, which is now defunct, was owned by the husband of a longtime associate of Zhou Min Ni and supplied nothing to the company. Zhou Min Ni and Jonathan Ni intentionally or recklessly misled HF Foods's Board of Directors and the public as to the nature of HF Foods's relationship with, and the reason for the ongoing series of promissory notes with, Feilong.

6.      Third, in 2018 and 2019, Zhou Min Ni, with the knowing assistance of Jonathan Ni from 2018 until April 2019, paid himself hundreds of thousands of dollars through a series of transactions involving another related party, UGO USA, Inc. ("UGO"). UGO, which was owned

by Zhou Min Ni and his niece, was paid $50,000 a month (more than its services were worth). It commonly passed on this money to a Chinese company that was wholly owned by Zhou Min Ni. Jonathan Ni helped conceal the true nature of ongoing payments from HF Foods to UGO and avoid questions from HF Foods's auditors by directing HF Foods employees to reclassify the payments as "advertising expense."

7.      Defendants also misrepresented the financial condition of HF Group and then HF Foods to auditors and investors. Prior to the de-SPAC transaction, Zhou Min Ni and Jonathan Ni knowingly, recklessly, or negligently signed representation letters to auditors that made false statements about the company's accounting practices and financial records. HF Group's auditors relied upon these false representation letters when they prepared audited financial statements that were later incorporated into proxy filings related to the de-SPAC transaction. Additionally, as CFO, Jonathan Ni prepared 2017 and 2018 financials of HF Group that contained false and misleading representations about the company. These financials were incorporated into proxy statements[2] used to solicit votes to complete the de-SPAC transaction.

8.      After HF Foods became a public company in 2018, Zhou Min Ni and Jonathan Ni signed public filings in October 2018 and April 2019 that they knew or were reckless in not knowing misrepresented and omitted material information about company funds that were being paid to Zhou Min Ni. Additionally, in April 2019 and April 2020, HF Foods, under Zhou Min Ni's leadership, issued proxy statements that omitted material information about company funds that were being paid to Zhou Min Ni and falsely asserted that the Board of Directors had conducted analyses of HF Foods's related party transactions. Zhou Min Ni also signed Forms 10-Q that were publicly filed on May 15, 2019, and August 14, 2019 that he knew, or was reckless

_____

[2] Proxy statements describe matters up for shareholder vote and include management and executive compensation information if the shareholders are voting for the election of directors.

in not knowing, omitted material information about company funds that were being paid to him. Finally, Zhou Min Ni and Jonathan Ni intentionally, recklessly, or negligently signed public certifications and management representation letters that misled the public and HF Foods's auditors about the company's accounting practices and financial records.

9.      In 2023, HF Foods announced a restatement of financial statements for fiscal years 2019 and 2020. The company further announced that it had determined, based on factual findings made by a Special Investigation Committee of HF Foods's Board of Directors ("SIC"): certain Revolution Industry advances, including payments for luxury cars, did not occur in the normal course of business, and certain payments should have been counted as compensation for Zhou Min Ni; Feilong was not a supplier to the Company and there is no evidence that funds from the line of credit were provided to Feilong (contrary to what had been represented to the Board and the public); and payments to UGO were not commensurate with the services provided.

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

11.     The Commission seeks permanent injunctions against Zhou Min Ni and Jonathan Ni enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; a conduct-based injunction against Zhou Min Ni, pursuant to Section 20(b) of the Securities Act and Sections 21(d)(1) and 21(d)(5) of the Exchange Act, preventing him from exercising any control or influence over HF Foods and any of its successors; civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange

Act; officer and director bar against Zhou Min Ni pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act; officer and director bar against Jonathan Ni pursuant to Section 21(d)(2) of the Exchange Act; disgorgement of ill-gotten gains from Zhou Min Ni pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act, plus prejudgment interest; and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.     Venue is proper in this Court pursuant to Sections 22(a) and (c) of the Securities Act and Section 27 of the Exchange Act. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Columbia, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, and as described later in this Complaint, HF Foods filed with the SEC in this judicial district multiple materially false and misleading documents, such as Forms 10-Q, 10-K, and 8-K.

## RELEVANT PARTIES

14.     **Zhou Min Ni**, age 55, resides in Greensboro, North Carolina. From 1997, when he co-founded HF Group, the predecessor to HF Foods, with his spouse, until his resignation on February 23, 2021, Zhou Min Ni served as Chairman of HF Foods; he served as CEO of HF Foods from 1997 until 2020, then co-CEO from November 2019 until his resignation on February 23, 2021.

15.     **Jian Ming "Jonathan" Ni**, age 51, resides in Greensboro, North Carolina. Jonathan Ni was a consultant to HF Group from 2003 to approximately 2015. He has been a certified public accountant ("CPA") licensed to practice in the State of North Carolina since January 2014. As of the date of this Complaint, Jonathan Ni's CPA license in North Carolina is in retired status. He was the CFO of HF Group beginning in 2015 and was CFO when it completed the de-SPAC process and became a public company (i.e., HF Foods) in August 2018. He resigned from his CFO position of HF Foods in April 2019.

16.     **HF Foods Group Inc. ("HF Foods") (NASDAQ: HFFG)**, a Delaware corporation currently headquartered in Las Vegas, Nevada, is a food service distributor to Asian restaurants in the United States. In August 2018, HF Foods became a public company through a reverse merger with a SPAC. HF Foods's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the Nasdaq Capital Market. HF Foods's fiscal year ends on December 31, and it files periodic reports, including Forms 10-K, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder. Through at least March of 2020, HF Foods had its principal executive offices in Greensboro, North Carolina.

17.     **Atlantic Acquisition Corp. ("Atlantic Acquisition")** (NASDAQ: ATACU), a Delaware corporation, was a blank check company that was formed as a SPAC in June 2017. A SPAC has no underlying business operations. A SPAC raises capital through an initial public offering and uses the proceeds to acquire an unidentified private operating company through a business combination transaction. After the SPAC combines with the private company via this merger transaction, also called the "de-SPAC process," it continues operating as a public

company. Atlantic Acquisition merged with HF Group in August 2018 through the de-SPAC process, then changed its name to HF Foods.

## **FACTS**

18.     Zhou Min Ni and his wife founded HF Group in 1997 in Kernersville, North Carolina. HF Group specialized in providing wholesale food to Asian-food restaurants.

19.     From the inception of HF Group, Zhou Min Ni served as the Chief Executive Officer ("CEO"), directing the growth of the business. HF Group, under Zhou Min Ni's leadership, formed or acquired other businesses, in addition to growing internally. Over several decades, the company increased considerably in size and operations.

20.     During the Relevant Period, Zhou Min Ni served as CEO of HF Foods from August 2018 to November 2019, and then as Co-CEO from November 2019 to February 2021. He served as Chairman of HF Foods from August 2018 to February 2021. He was an experienced CEO knowledgeable about HF Group's and HF Foods's business operations and was regularly briefed on HF Foods's financial status, including its revenue, margins, expenses, and profits. Zhou Min Ni was also kept informed about HF Foods's relevant loans and lines of credit.

21.     Jonathan Ni began working with HF Group in 2003 as a consultant, providing general business analysis for Zhou Min Ni and his family. As time passed, Jonathan Ni took on greater responsibilities. In 2014, Jonathan Ni became a CPA in North Carolina. By 2015, he had officially become Chief Financial Officer ("CFO") for HF Group, then a private company.

22.     As CFO and a CPA, Jonathan Ni managed the company's finances, including leading the team that prepared the company's general ledgers. The team consisted of a comptroller, who worked for HF Group and HF Foods on a contract basis, and two or three

general accountants. Jonathan Ni regularly received and reviewed internal financial statements that were prepared by the accounting team.

23.     Prior to August 2018, HF Group was a private company co-owned by Zhou Min Ni and his spouse. In August 2018, HF Group transformed from a private company into HF Foods, a publicly-listed company, via a de-SPAC transaction with Atlantic Acquisition, a publicly-traded company. After the de-SPAC transaction, Zhou Min Ni became Chairman of HF Foods and continued to serve as CEO of HF Foods until November 2019, and then as co-CEO and Chairman from then until February 2021.

24.     In 2017, HF Group, under the leadership of Zhou Min Ni, began communicating with Atlantic Acquisition, the SPAC that would ultimately merge with HF Group. Atlantic Acquisition recommended that HF Group retain the services of an external consultant to help guide it through the process of selling shares to the public, commonly referred to as "going public" or becoming a "public company." In the leadup to HF Group going public, Jonathan Ni and the financial team he supervised helped reorganize the company's financials in response to comments and questions from its external auditor, its attorneys, and the external consultant recommended by Atlantic Acquisition.

25.     As HF Group transitioned from a private to a public company, Zhou Min Ni and Jonathan Ni knew it needed to change or eliminate certain financial practices to effectuate a merger and comport with public expectations. First, Zhou Min Ni and his family used HF Group's business proceeds to buy, maintain and insure a fleet of exotic and luxury cars. The title to these cars was held by an HF Group subsidiary. Second, HF Group offered its employees a loan program: it allowed employees to contribute money to an internal company account (that was subsequently commingled with the company's general operating fund) at a "guaranteed" rate

of return. Third, HF Group had an ongoing relationship with UGO, a company that was owned by Zhou Min Ni and his niece and that provided HF Group with some professional services in exchange for money (with the payments far greater than the value of the services provided).

26.     During the Relevant Period, Zhou Min Ni, with the knowing assistance of Jonathan Ni between 2018 until April 2019, worked to conceal these problems and signed public disclosures that misled investors about them.

### A.     The "Revolution" Scheme: Using HF Foods Cash to Pay for Luxury Cars

27.     Before HF Group became a public company, Zhou Min Ni used its business proceeds to purchase and lease cars for his and his family's personal use. These included luxury cars (a BMW, an Audi, and a Porsche) kept for daily use by Zhou Min Ni and his family, as well as exotic sports cars (various Ferraris, a Bentley, a Dodge Viper, and a rare Ford GT) purchased for the use of Zhou Min Ni's son. Jonathan Ni was also aware of and involved in the transactions. He helped finance the cars on Zhou Min Ni's behalf, signed documents to purchase some of the cars, and was involved in the management of the HF Group subsidiary (a trucking service business) that held the title to these cars.

28.     Zhou Min Ni and Jonathan Ni knew that there was no business reason for HF Group's trucking subsidiary to hold title to exotic cars. Thus, as the company prepared to become a public company, Zhou Min Ni directed Jonathan Ni to orchestrate a scheme to hide the company's continued funding of luxury and exotic cars for Zhou Min Ni and Zhou Min Ni's son. This scheme, which continued until at least 2021, long after the company had gone public, was carried out via a series of transactions with entities co-owned by Zhou Min Ni and his son.

29.     Beginning in mid-2017, Jonathan Ni directed HF Group's outside counsel to set up three private entities: Revolution Industry, Revolution Automotive, and Revolution Property:

a.   <u>Revolution Industry</u>: The stated purpose of this entity, which was formally founded in February 2018, was to spin off HF Group's profitable egg roll mix business into a separate company that was initially co-owned by Zhou Min Ni and his then-teenage son, then later wholly owned by the son. Though it was purportedly a separate company, Revolution Industry continued to produce egg roll mix at HF Group's Greensboro warehouse, leasing the space from HF Group, using production equipment it purchased from HF Group, and paying the same HF Group employees who used to work on egg roll mix production. HF Group then purchased the egg roll mix from Revolution Industry.

b.   <u>Revolution Automotive</u>: The stated purpose of this entity was to take over the luxury vehicles owned by HF Group's trucking subsidiary and to maintain and expand the fleet. When this entity was first established in July 2017, it was jointly owned by Zhou Min Ni and his then-teenage son, though his son ultimately became the 100% owner. Revolution Automotive's purported business plan was to generate profit by organizing and hosting road rallies, as well as trading luxury vehicles, but this plan was never realized, and the luxury vehicles owned by Revolution Automotive remained solely for the personal use of Zhou Min Ni and his family.

c.   <u>Revolution Property</u>: The stated purpose of this entity was to acquire land and build a warehouse for the luxury vehicles owned by Revolution

Automotive. This business plan was never realized, and Revolution

Property remained a paper entity.

30.     HF Group and later HF Foods, with Zhou Min Ni and Jonathan Ni's knowledge

and approval, made improper payments of approximately $2.4 million to Revolution Industry

and Revolution Automotive between August 2018 and December 2020. From August 2018 until

his departure from the company in April 2019, Jonathan Ni enabled these improper payments.

Though HF Foods represented that these advances occurred in the normal course of business, a

portion of the money was used to maintain and expand the fleet of luxury vehicles owned by

Revolution Automotive, which were ultimately enjoyed by Zhou Min Ni's family. As a result,

HF Foods's public filings signed by Zhou Min Ni and Jonathan Ni in 2018 and 2019 misstated

the compensation paid to Zhou Min Ni by the same amount.

31.     Although certain transactions between HF Foods and Revolution Industry may

have been legitimate, part of the money sent by HF Foods to Revolution Industry (which was

then forwarded to Revolution Automotive) appears to have been provided for the sole purpose of

making payments for luxury vehicles. For example, in August 2018, after HF Foods had gone

public, an HF Foods employee e-mailed HF Foods's Treasurer, stating that Revolution

Automotive had a nearly $60,000 unpaid balance for the month. The Treasurer responded that

the HF Foods employee could "cut the check to Revolution industry. Then [Revolution Industry]

can pay to [Revolution Automotive]."[3]

32.     Zhou Min Ni, as the joint owner of the Revolution entities, was aware that money

was flowing from HF Foods, through Revolution Industry, into Revolution Automotive. Zhou

Min Ni also was aware that Revolution Automotive was using the money transferred from HF

---

[3] In early 2018, HF Group made several payments directly to Revolution Automotive, even though there was no legitimate commercial relationship between HF Group and Revolution Automotive.

Foods, via Revolution Industry, to pay the expenses incurred for his family's fleet of automobiles.

33.     Jonathan Ni, as a CPA and the CFO of HF Foods, knew that a public company should not have a fleet of luxury and exotic vehicles on the books of a subsidiary. And he also knew, as a close business associate of Zhou Min Ni and a personal confidante of Zhou Min Ni's son, that the Revolution entities were used to divert funds from HF Foods to maintain and expand the fleet of luxury vehicles for the benefit of Zhou Min Ni's family. Thus, Jonathan Ni worked with HF Group's company lawyers to execute a series of transactions that established the Revolution entities and transferred the vehicles from HF Group to Revolution Automotive. He reviewed and authorized certain payments made by HF Group and later HF Foods to the Revolution entities, which were ultimately used to finance the vehicles.

34.     Jonathan Ni signed HF Foods's public filings that contained material misstatements about HF Foods's payments to Revolution Industry. *See infra* ¶¶ 61–78. CFO knew or was reckless in not knowing that the public filings were materially false and misleading, because they failed to disclose that payments to Revolution Industry and Revolution Automotive for what they actually were: compensation to the CEO. By concealing HF Foods's ongoing undisclosed compensation to its CEO, Jonathan Ni materially misled investors.

35.     Ultimately, after Jonathan Ni left the company, HF Foods determined that payments to Revolution Industry were improper. In its Form 10-K for 2021, which was filed in 2023, HF Foods admitted: "[c]ertain advances to Revolution Industry, LLC ("Revolution Industry"), in particular, payments for luxury cars, did not occur in the normal course of business. The Company has determined that certain payments to Revolution Industry should be accounted for as compensation expense, including in the previously filed financial statements, as

Revolution Industry and Revolution Automotive, LLC were used to obtain funds which paid for luxury cars to the benefit of the Ni family."

36.     As CEO and CFO of HF Foods, Zhou Min Ni and Jonathan Ni signed HF Foods's public filings that contained material misstatements about HF Foods's payments to Revolution Industry. *See infra* ¶¶ 61–87. Defendants knew or were reckless in not knowing that the public filings were materially false and misleading, because they failed to disclose that payments to Revolution Industry and Revolution Automotive for what they actually were: compensation to Zhou Min Ni. By concealing HF Foods's ongoing undisclosed compensation to its CEO, Zhou Min Ni and Jonathan Ni materially misled investors.

### B.     The Staff Loan Scheme: Hiding Millions of Liabilities

37.     For years before it went public, HF Group ran a loan program for its employees, business associates, and their relatives. The Staff Loan Program, which was started by Zhou Min Ni and had at least sixty-two participants, promised guaranteed rates of return to participants for providing money to HF Group. Participants could make actual cash deposits or choose to automatically deposit portions of their salary directly into the program. The program funds were commingled with HF Group's general operating funds, where much of it was used to pay for the day-to-day operations of the company. In addition, some program funds were used to help pay for Zhou Min Ni's real estate investments. HF Group and HF Foods documents described the Staff Loan Program balance as "Loan to Staff," and as investments to affiliated companies.

38.     Before HF Group became a public company, its consultants and auditors advised its senior management, including Zhou Min Ni and Jonathan Ni, that the Staff Loan Program balance should be removed from HF Group's books.

39.     With Zhou Min Ni's knowledge and approval, Jonathan Ni helped remove the Staff Loan Program balance from HF Group's accounting records, even while HF Group

continued to repay the loans off the books. In anticipation of going public, the Staff Loan Program was purportedly discontinued on October 31, 2017, and purportedly removed from HF Group's books in November 2017 through a series of adjusting journal entries that offset the outstanding program balance partially against assets listed on HF Group's books and recording other credits.. These accounting entries included references to Zhou Min Ni assuming the debt "personally." But, as Jonathan Ni knew, he and Zhou Min Ni removed the liability from HF Foods books by creating a purported line of credit between HF Foods and Feilong, a now-defunct company connected to a business partner of Zhou Min Ni.

40.    In January 2018, Zhou Min Ni reached out to this business partner and asked her to take responsibility for interest payments on a personal obligation he had to HF Group (but not the obligation itself). According to the business partner, Zhou Min Ni never said what the obligation was for. The business partner also recalled speaking with Jonathan Ni about the obligation. No one told the program's participants that Zhou Min Ni, Feilong, or any other third party was taking over the repayment obligation of the program.

41.    The Staff Loan Program continued even after the liability was removed from the books and after HF Foods became a public company. HF Foods continued to pay out interest and return principal in cash to program participants via HF Foods's cash-on-hand account. But because the program was no longer on HF Foods's books, Staff Loan transactions were now—at Jonathan Ni's direction—inaccurately recorded in the "Due to/from Feilong" general ledger account, with interest payments recorded as "Feilong Fee" and withdrawal of principal recorded as "Feilong Withdraw." In other words, when HF Foods paid cash to program participants, it recorded an offsetting receivable owed by Feilong, as if HF Foods were making the payments on behalf of Feilong.

42.     To account for these ongoing payments, supposedly made by HF Foods on behalf of Feilong, HF Foods issued a series of notes receivable (lines of credit and promissory notes) purportedly with Feilong and purportedly signed by Zhou Min Ni's business partner, in increasing amounts. The notes covered the amounts that HF Foods continued to pay out of its cash-on-hand account in connection with the program. Bank records do not show any transfer of funds from Feilong to HF Foods in connection with the program nor any transfer of funds from HF Foods to Feilong under the promissory notes.

43.     Jonathan Ni was responsible for drafting at least part of the first note receivable that was exchanged with Feilong in September 2017, which supposedly provided Feilong with a $1.5 million line of credit. Jonathan Ni also reviewed two additional notes receivable that were exchanged with Feilong on February 15, 2018, and September 30, 2018. These additional notes expanded the purported line of credit to $3 million and $4 million, respectively.

44.     To get approval for this supposed business loan to Feilong, Zhou Min Ni and Jonathan Ni knowingly or recklessly misrepresented the nature of the relationship between HF Foods and Feilong to HF Foods's Board of Directors, falsely telling the Board at a meeting on September 7, 2018, that Feilong supplied food containers for HF Foods and that HF Foods needed to loan Feilong money to ensure a reliable supply chain. But there is no evidence that Feilong ever supplied anything to HF Foods.

45.     Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing that Feilong did not actually supply HF Group or HF Foods with anything, that the supposed transactions between HF Foods and Feilong only existed on paper, and that HF Foods's line of credit and promissory notes with Feilong were created to give the false impression that the Staff Loan did not exist in HF Foods's books. Zhou Min Ni and Jonathan Ni also knew that HF Foods was

16

recording payments to staff members that were due under the Staff Loan Program as loans extended to Feilong, even though they knew that Zhou Min Ni was the person actually responsible for the debt.

46.     Nonetheless, Zhou Min Ni and Jonathan Ni knowingly or recklessly misrepresented the true nature of the relationship with Feilong to HF Foods's auditors and its Board of Directors. Zhou Min Ni and Jonathan Ni knew, or were reckless in not knowing, that this constituted a material misrepresentation that made HF Foods's public filings inaccurate. As CEO and CFO of HF Foods, Zhou Min Ni and Jonathan Ni also signed HF Foods's public filings that misstated HF Foods's liabilities and omitted material information regarding the Staff Loan Program and the true nature of the Feilong notes. *See infra* ¶¶ 61–78.

47.     In March 2019, Zhou Min Ni issued a personal guarantee for the Feilong note receivable, which then had an outstanding balance of $3.6 million. In September 2019, Zhou Min Ni purchased the Feilong note receivable using his HF Foods stock.

## C.     The UGO Scheme: Overpaying Zhou Min Ni for "Professional Fees"

48.     UGO was incorporated in North Carolina in May 2017 as an entity that was 30% owned by Zhou Min Ni and 70% by his niece. Its principal offices were at HF Group's headquarters. UGO appears to have had only four employees, one of whom was Zhou Min Ni's niece.

49.     Beginning in January 2018, HF Group began paying UGO $50,000 per month for "professional services." HF Group paid UGO purportedly in exchange for creating an online shopping portal for HF Group and a mobile application through which HF Group's customers could place orders. But UGO actually provided these services by subcontracting with a China-based company that was wholly owned by Zhou Min Ni. UGO made numerous $50,000 payments to Zhou Min Ni's company in China—essentially, passing along the fees paid by HF

Foods to Zhou Min Ni. Between August 2018 and 2021, UGO received approximately $1

million in total from HF Group and HF Foods, purportedly for professional services.

50.     Zhou Min Ni provided directions to his niece regarding how to run UGO. Zhou

Min Ni also was responsible for choosing the China-based subcontractor, which he wholly

owned, to create and maintain UGO's website. Zhou Min Ni negotiated the agreement between

UGO and the subcontractor, and Zhou Min Ni directed his niece to make payments from UGO to

both the subcontractor and to Zhou Min Ni directly.

51.     Jonathan Ni took actions furthering the scheme to take money out of HF Group

and later HF Foods for Zhou Min Ni's benefit. In an email dated March 29, 2018, HF Group's

Controller told HF Group's Treasurer that Jonathan Ni would speak to her about preparing

monthly invoices for UGO to submit to HF Group, despite the fact that neither Jonathan Ni, nor

the Controller, nor the Treasurer were employees of UGO. In March 2018, Jonathan Ni also

directed HF Group's finance personnel to reclassify in HF Group's books and records the

payments to UGO from "professional fees" to "advertising expense," which helped to avoid

further questions about the payments from HF Group's auditors.

52.     Ultimately, in its 2023 Restatement, HF Foods concluded that the amounts paid to

UGO that were eventually forwarded to Zhou Min Ni should have been recorded as

compensation for Zhou Min Ni. HF Foods also later concluded that the services provided by

UGO were not commensurate with the amount paid by HF Foods—including approximately $1

million after HF Foods became a public company.

53.     Zhou Min Ni and Jonathan Ni knew, or were reckless in not knowing, that HF

Foods's payments to UGO constituted compensation to Zhou Min Ni. Zhou Min Ni and Jonathan

Ni also knew that HF Foods was paying UGO $50,000 per month and that Zhou Min Ni was

receiving a large portion of these monthly payments. Zhou Min Ni and Jonathan Ni knew that Zhou Min Ni owned 100% of the Chinese entity that subcontracted with UGO. Indeed, according to Jonathan Ni, he believed that payments went to UGO so that Zhou Min Ni could recoup expenses he had incurred in setting up the online portal and mobile application. Zhou Min Ni and Jonathan Ni also knew, or were reckless in not knowing, that Zhou Min Ni had not provided any documentation of expenses that would justify receiving these payments.

### D.  As CFO Prior to the De-SPAC Merger, Jonathan Ni Prepared Financial Statements That Misled the Public

54.    As part of the SPAC process, Atlantic Acquisition (the company that ultimately merged with HF Group) publicly filed proxy statements with the SEC in support of the de-SPAC transaction. The proxy statements included HF Group's misleading financials for 2017 and the first quarter of 2018 and contained other misrepresentations and omissions about HF Group.

55.    Specifically, Atlantic filed proxy statements on April 6, May 24, June 15, July 5, and July 18, 2018. All of these proxy statements contained substantially similar false and misleading statements. Among other issues, all of the proxy statements falsely and misleadingly assert that HF Group's financials were prepared according to GAAP.

56.    Additionally, the Atlantic proxy statements from May, June, and July note that HF Foods provided an advance of $334,341 to Revolution Industry in the normal course of business, when in fact the funds were eventually diverted to Revolution Automotive to finance luxury vehicles.

57.    These misstatements were material. Reasonable investors would have wanted to know that the company's financials were not prepared in accordance with GAAP and that the company was providing advances to a related party that were being used to pay for luxury cars.

58.     Zhou Min Ni, as HF Group's CEO, knew that the line of credit and promissory notes with Feilong existed to create the false impression that the liability for the Staff Loan Program had been removed legitimately from HF Group's books. Zhou Min Ni nonetheless signed management representation letters to HF Foods's auditors on March 14, 2018, May 24, 2018, and August 27, 2018, that contained misstatements, including letters provided to auditors concerning financial statements for the 2018 de-SPAC transaction that were included in Atlantic Acquisition's pre-transaction proxy statements.

59.     Jonathan Ni was HF Group's CFO and was intimately familiar with the Revolution entities, the UGO scheme, and the Staff Loan Program, as well as HF Group's financials. Prior to the de-SPAC transaction, Jonathan Ni reviewed and prepared financial information for HF Group that he knew to be inaccurate, and that he helped cause to be inaccurate. He was responsible for providing that information to Atlantic Acquisition and knew that this information was ultimately included in proxy statements that were publicly disseminated. He also knew that the proxy statements included auditor's reports relating to materially false and misleading letters that he had signed and sent to HF Group's auditors (*see infra* ¶¶ 88–94). He therefore knew or was reckless in not knowing that these proxy statements contained materially misleading information and omitted facts necessary to render material statements in the proxy not misleading.

60.     Zhou Min Ni and Jonathan Ni intentionally, recklessly, or negligently reviewed and prepared financial information for HF Group that they knew to be inaccurate, and that they helped cause to be inaccurate. They were responsible for providing these materially misleading statements or omissions in the financials that were given to Atlantic Acquisition. As a result of

the Defendants' actions, Atlantic Acquisition publicly filed and used proxy statements to

approve the de-SPAC transaction with HF Group that were materially false or misleading.

E.   **As CEO and CFO of HF Foods, Zhou Min Ni and Jonathan Ni Signed False and Misleading Public Filings and Made Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act**

61.    As HF Foods's CEO, Zhou Min Ni was aware of the schemes involving the

Revolution entities, UGO, and the Staff Loan program as well as the fact that HF Foods made

materially false and misleading statements about the various schemes. At the very least, as the

CEO of HF Foods, Zhou Min Ni was reckless in not knowing that these transactions were not

accurately disclosed in HF Foods's public filings. Zhou Min Ni signed all of the company's 10-Q

and 10-K filings during his tenure as CEO from August 2018 to November 2019 and as co-CEO

from November 2019 to February 2021.

62.    As CFO of a public company and a CPA, Jonathan Ni led the internal team that

prepared the company's financial statements. He answered questions from the audit and

consulting teams, who prepared and submitted initial drafts for his review. Jonathan Ni drafted

portions of HF Foods's 2018 Form 10-K and signed the company's 2018 third quarter Form 10-

Q and 2018 Form 10-K filings.

63.    HF Foods's CEO and CFO were required, pursuant to Section 302 of the

Sarbanes-Oxley Act [15 U.S.C. § 7241] ("SOX"), to sign certain certifications when filing

periodic reports with the Securities and Exchange Commission. Thus, when Zhou Min Ni signed

and submitted HF Foods's Form 10-Q for Q3 2018 and Forms 10-Q for the first three quarters of

2019 and 2020, in addition to annual reports on Form 10-K for 2018 and 2019, he certified,

among other things, that HF Foods's filings did not contain any untrue statement of a material

fact and that he had evaluated the effectiveness of HF Foods's internal controls. During the

months when Jonathan Ni served as CFO and HF Foods was a public company, Jonathan Ni

prepared and signed documents that certified that he had evaluated the effectiveness of HF Foods's internal controls.

### 1. Zhou Min Ni and Jonathan Ni Signed HF Foods's Form 10-Q For Q3 2018, Which Materially Misled Investors

64.     After the de-SPAC transaction, HF Foods filed a Form 10-Q for the third financial quarter of 2018 on November 14, 2018. Zhou Min Ni and Jonathan Ni signed this Form 10-Q, which they knew, or were reckless in not knowing, contained multiple materially false or misleading statements.

65.     Specifically, HF Foods's Form 10-Q stated that it had made $362,077 in cash advances to Revolution Industry, which it described as "made in the normal course of business." This was false—as HF Foods itself acknowledged in its 2021 Form 10-K, these advances were *not* always made in the ordinary course of business. Rather, as Zhou Min Ni and Jonathan Ni knew, or were reckless in not knowing, HF Foods had made at least $60,000 in advance payments to Revolution Industry, specifically timed to pay Revolution Automotive's outstanding bills. *See supra*, ¶ 31.

66.     HF Foods's Form 10-Q also falsely stated that it had "entered into a line of credit promissory note agreement with Feilong Trading, Inc., which is a supplier to the Company." Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing that Feilong was *not* a supplier to the company, that HF Foods never provided funds to Feilong, and that the notes receivable were not provided in the ordinary course of business. Moreover, the Form 10-Q failed to state the true purpose of the Feilong Note—to conceal HF Foods's ongoing debt to its employees.

67.     Zhou Min Ni and Jonathan Ni also signed the certifications that were attached to HF Foods's third quarter 2018 Form 10-Q as Exhibits 31.1 and 31.2, respectively. Accordingly,

Zhou Min Ni and Jonathan Ni knowingly or recklessly, certified the following false and misleading statements:

> a.     The 10-Q contained no false statements of material fact or omissions of material facts necessary to make the statements made not misleading;
>
> b.     The 10-Q "fairly present[ed] in all material respects" the "financial condition, results of operations and cash flows" of HF Foods;
>
> c.     HF Foods had established and maintained disclosure controls and procedures and internal control over financial reporting;
>
> d.     They had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

68.     For all the reasons stated above, these representations that HF Foods's Form 10-Q contained no false statements of material fact and fairly presented the financial condition of HF Foods were false and/or misleading. According to Jonathan Ni, only he, HF Foods's auditors, and HF Foods's consultants were involved in the internal control process in 2018. Zhou Min Ni and Jonathan Ni knew or should have known that HF Foods's internal controls over financial reporting were not comprehensively documented as of the end of 2018, and that there was no written policy of internal controls at that time. Zhou Min Ni and Jonathan Ni also knew, were reckless in not knowing, or should have known that they never received an internal control report from HF Foods's consultants. Thus, Zhou Min Ni and Jonathan Ni knew, were reckless in not knowing, or should have known that HF Foods had not sufficiently assessed its internal controls, and that the representation relating to HF Foods's disclosure controls and procedures and internal controls over financial reporting were false.

69.     Zhou Min Ni and Jonathan Ni also signed a second certification pursuant to Section 906 of the Sarbanes-Oxley Act [18 U.S.C. § 1350] that was attached to HF Foods's 2018 3Q Form 10-Q as Exhibit 32. In this document, Zhou Min Ni and Jonathan Ni, intentionally or recklessly, falsely certified that the 10-Q "fully compl[ied] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "fairly present[ed], in all material respects, the financial condition and results of operation of the Company." For the reasons described above, Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing this was untrue.

70.     These misstatements were material. Reasonable investors would have wanted to know that HF Foods was paying its CEO (via Revolution Industry) hundreds of thousands of dollars under the table, and that it was concealing millions of dollars of ongoing debt to its own employees by creating a purported line of credit to a company with no real business relationship to HF Foods. Moreover, reasonable investors would have wanted to know that Zhou Min Ni and Jonathan Ni had failed to evaluate the effectiveness of HF Foods's internal control over financial reporting using any suitable framework.

### 2.     Zhou Min Ni and Jonathan Ni Signed HF Foods's Form 10-K For FY 2018, Which Materially Misled Investors

71.     On April 1, 2019, HF Foods filed with the SEC its Form 10-K for the 2018 fiscal year. Zhou Min Ni and Jonathan Ni signed this document, which they knew, or were reckless in not knowing, contained multiple materially false and misleading statements.

72.     Specifically, HF Foods's 2018 Form 10-K stated that HF Foods had "entered into a line of credit promissory note agreement with Feilong Trading, Inc., which is a supplier to the Company." For the reasons described above, Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing, that Feilong was *not* a supplier to the company; that HF Foods, in fact,

never provided funds to Feilong; and that the notes receivable were not provided in the ordinary course of business. Moreover, the Form 10-K failed to state the true purpose of the Feilong Note: to conceal millions of dollars in HF Foods's ongoing debt to its employees.

73.     HF Foods's Form 10-K also included additional misstatements in its consolidated balance sheet. Specifically, it materially understated HF Foods's distribution, selling and administrative expenses (the line item that included executive compensation) by counting the money paid to Revolution Industry in 2018 as "cost of revenue."

74.     Zhou Min Ni and Jonathan Ni also signed the certifications that were attached to the Form 10-K as Exhibit 31.1 and 31.2, respectively. Accordingly, Zhou Min Ni and Jonathan Ni knowingly or recklessly, falsely certified the following false and misleading statements:

a.      The 10-K contained no false statements of material fact or omissions of material facts necessary to make the statements made not misleading;

b.      The 10-K "fairly present[ed] in all material respects" the "financial condition, results of operations and cash flows" of HF Foods;

c.      They had designed, or caused to be designed, internal control over financial reporting, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

d.      They had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

75.     For all the reasons stated above, these representations that HF Foods's 10-K contained no false statements of material fact and fairly presented the financial condition of HF

Foods were false or misleading. Moreover, as with HF Foods's 10-Q for the third quarter of 2018, Zhou Min Ni and Jonathan Ni knew or should have known that HF Foods did not, in fact, have sufficient internal controls over financial reporting.

76.     Zhou Min Ni and Jonathan Ni also signed second SOX Certifications that were attached to HF Foods's Form 10-K as Exhibit 32.1 and 32.2, respectively. In these documents, Zhou Min Ni and Jonathan Ni certified that the 10-K "fully compl[ied] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "fairly present[ed], in all material respects, the financial condition and results of operation of the Company." For all the reasons described above, Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing that this was untrue.

77.     These were material misstatements. Reasonable investors would have wanted to know that HF Foods had created a fictitious relationship with a purported "supplier" that provided no actual goods or services in order to conceal the payments it was making to the Staff Loan Program participants. Reasonable investors would have wanted to know that HF Foods was hiding hundreds of thousands of dollars in executive compensation on its balance sheet, thereby understating its administrative costs. And reasonable investors would have wanted to know that the company—and Zhou Min Ni and Jonathan Ni—had not evaluated the effectiveness of HF Foods's internal control over financial reporting using any suitable framework.

78.     Jonathan Ni officially retired from HF Foods on April 1, 2019, the same day that HF Foods publicly filed the 2018 Form 10-K (which he signed).

### 3.     Zhou Min Ni Signed Six Additional Forms 10-Q for HF Foods, Which Materially Misled Investors

79.     As CEO of HF Foods, Zhou Min Ni signed HF Foods's Forms 10-Q for the first three quarters of 2019 and the first three quarters of 2020. Each of these public filings by HF

Foods misstated the Staff Loan Program and the true nature of the Feilong notes, similar to the third quarter 2018 Form 10-Q described *supra*, Paragraph 66. Specifically, the 2019 and 2020 filings state that HF Foods entered into a line of credit promissory note agreement with Feilong and describe it as a supplier, even though Feilong was not a supplier and the line of credit promissory note was only created to conceal the company's continued involvement in the Staff Loan Program transaction.

80.     The Forms 10-Q for the first and second quarter of 2019 also materially misstated HF Foods's liabilities by omitting the money that HF Foods owed its employees. Zhou Min Ni knew or was reckless in not knowing that these statements were materially inaccurate, in light of his role in creating and concealing the Staff Loan Program.

### 4.     Zhou Min Ni Signed HF Foods's Form 10-K For FY 2019, Which Materially Misled Investors

81.     On March 16, 2020, HF Foods filed with the SEC its Form 10-K for the 2019 fiscal year. Zhou Min Ni signed this document, which he knew, or was reckless in not knowing, contained multiple material false and misleading statements.

82.     Specifically, HF Foods's Form 10-K stated that it had "entered into a line of credit promissory note agreement with Feilong Trading, Inc., which is a supplier to the Company." For the reasons described above, Zhou Min Ni knew or was reckless in not knowing that Feilong was *not* a supplier to the company, that HF Foods, in fact, never provided funds to Feilong, and that the notes receivable were not provided in the ordinary course of business. Moreover, HF Foods's Form 10-K failed to state the true purpose of the Feilong Note—to conceal millions of dollars in HF Foods's ongoing debt to its employees.

83.     HF Foods's Form 10-K also included additional misstatements in its consolidated balance sheet. Specifically, it materially understated HF Foods's distribution, selling and

administrative expenses (the line item that included executive compensation) by counting the money paid to Revolution Industry in 2019 as "cost of revenue."

84. Zhou Min Ni also signed the certifications that were attached to the Form 10-K as Exhibit 31.1. Zhou Min Ni therefore, knowingly or recklessly, falsely certified the following:

     a. The 10-K contained no false statements of material fact or omissions of material facts necessary to make the statements made not misleading;

     b. The 10-K "fairly present[ed] in all material respects" the "financial condition, results of operations and cash flows" of HF Foods;

     c. Along with HF Foods's other certifying officer, he had designed, or caused to be designed, internal control over financial reporting, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

     d. Along with HF Foods's other certifying officer, he had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

85. For all the reasons stated above, these representations that HF Foods's Form 10-K contained no false statements of material fact and fairly presented the financial condition of HF Foods were false or misleading. Moreover, as with HF Foods's Forms 10-Q, Zhou Min Ni knew, was reckless in not knowing, or should have known that HF Foods did not, in fact, have sufficient internal controls over financial reporting.

86.     Zhou Min Ni also signed a second SOX Certification that was attached to the Form 10-K as Exhibit 32.1. In this documents, Zhou Min Ni certified that the 10-K "fully compl[ied] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "fairly present[ed], in all material respects, the financial condition and results of operation of the Company." For all the reasons described above, Zhou Min Ni knew, was reckless in not knowing, or should have known that this was untrue.

87.     These misstatements were material. Reasonable investors would have wanted to know that HF Foods had created a fictitious relationship with a purported "supplier" that provided no actual goods or services in order to conceal the payments it was making to Staff Loan Program participants. Reasonable investors would have wanted to know that HF Foods was hiding hundreds of thousands of dollars in executive compensation on its balance sheet, thereby understating its administrative costs. And reasonable investors would have wanted to know that the company— and Zhou Min Ni—had not evaluated the effectiveness of HF Foods's internal control over financial reporting using any suitable framework.

F.     **Zhou Min Ni and Jonathan Ni Made False and Misleading Representations to HF Group's and HF Foods's Auditors**

88.     Between March 2018 and April 2019, Jonathan Ni signed five management representation letters on behalf of HF Group and later HF Foods that were sent to the company's auditor. Many attestations made in these letters were false and misleading.

89.     Between March 2018 and November 2020, Zhou Min Ni signed at least eight management representation letters on behalf of HF Group and later HF Foods that were sent to their auditor. Many attestations made in these letters were false and misleading.

90.     Specifically, the letters signed by Zhou Min Ni and Jonathan Ni made the following false and misleading statements about HF Foods and its financial reporting, using the same or substantially similar language:

   a.     The financial statements referred to above are fairly presented in conformity with U.S. [GAAP], and include all disclosures necessary for such fair presentation and disclosures required to be included therein by the laws and regulations to which the Company is subject.

   b.     We have made available to you all — a) financial records and related data, including the names of all related parties and all relationships and transactions with related parties. . . .

   c.     There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

   d.     We have no knowledge of any fraud or suspected fraud affecting the Company involving: a) Management, b) Employees who have significant roles in internal control of financial reporting, or c) Others where the fraud could have a material effect on the financial statements.

   e.     The following have been properly accounted for and adequately disclosed in the financial statements: a) Related party relationships or transactions, including sales, purchases, loans, transfers, leasing arrangements, guarantees, and amounts receivable from or payable to related parties. . . .

91.     Zhou Min Ni and Jonathan Ni knew or were reckless in not knowing that these statements were false and misleading because HF Foods's financial statements did not comply with GAAP; because HF Foods had concealed numerous material facts from its auditors;

because the leadership of HF Foods was aware of ongoing fraud involving Zhou Min Ni and his family; and because HF Foods had failed to properly disclose transactions with related parties like Revolution Industry designed to enrich Zhou Min Ni.

92.      These misstatements were material. Reasonable investors would have wanted to know that HF Foods was not preparing its financial statements in accordance with GAAP; that it was failing to properly record and disclose the nature of material transactions; and that its CFO and CEO were aware of ongoing fraud.

93.      The audited financial statements of HF Group and the auditor's report relating to these false management letters were ultimately included in proxy statements filed by Atlantic Acquisition Corp. (the pre-merger SPAC) in the spring and summer of 2018 to solicit votes to approve its reverse merger with HF Group. These filings therefore materially misstated the company's liabilities and administrative expenses.

94.      The practice continued after HF Foods became a public company. The audited financial statements of HF Foods related to these false management letters signed by Zhou Min Ni and Jonathan Ni were also included in HF Foods's 2018 third quarter Form 10-Q and 2018 Form 10-K. They were also included in HF Foods's Forms 10-Q from 2019 and 2020 and in HF Foods's Form 10-K from 2019.

**G.      Zhou Min Ni and HF Foods Solicited Proxies in 2019 and 2020 With Definitive Proxy Statements That Materially Misled Investors**

95.      On April 30, 2019, and April 29, 2020, HF Foods publicly filed definitive proxy statements, which it used to solicit proxies in connection with its 2019 and 2020 annual meetings.

96.     At the time of both definitive proxy statements, Zhou Min Ni was the CEO of HF Foods and Chairman of HF Foods's Board of Directors. Zhou Min Ni was a nominee for whose election as director the proxies were solicited.

97.     The 2019 and 2020 definitive proxy statements contained numerous misstatements regarding HF Foods's related party transactions, including a false assertion that the Board of Directors had "analyzed the prices paid to these Related Parties as well as the level of service, reliability, delivery terms, and historical performance of these Related Parties and has concluded that such prices and terms are substantially equivalent to, or more advantageous than, prices and terms the Company would receive in arm's length transactions from third parties that have no relationship with the Company and are capable of providing the same level of service." No such analysis occurred regarding HF Foods's relationship to Revolution Industry or UGO.

98.     Additionally, the 2019 and 2020 definitive proxy statements materially understated Zhou Min Ni's executive compensation amounts by omitting money he was receiving through his connection to Revolution Industry and UGO.

99.     These misstatements and omissions were material. HF Foods shareholders would have wanted to know that the Board of Directors was failing to evaluate related parties with whom HF Foods was doing business. Shareholders also would have wanted to know that the company's CEO and Chairman of the Board of Directors was receiving undisclosed compensation.

**H.     The HF Foods Fraud Is Partially Revealed**

100.     On March 23, 2020, a financial research company that describes itself as specializing in forensic financial research released a public report ("Report") that alleged misappropriation of company funds and accounting irregularities at HF Foods. The Report

32

accused HF Foods of concealing material facts from investors, some of which have been described in this Complaint.

101.    Specifically, the Report noted that Zhou Min Ni's son publicly advertised his use of a fleet of luxury cars, which were publicly owned by a subsidiary of HF Foods, and noted the ongoing relationship between HF Foods and Revolution Industry. The Report also noted that over $1 million in shareholder money had been transferred to UGO from HF Foods, from 2018 through March 2020.

102.    In the aftermath of the Report, HF Foods stock dropped from $12.32 per share on March 22, 2020, to close at $9.80 per share on March 23—a one-day drop of 20.5% on heavy trading volume.

I.    **Zhou Min Ni Signs a False and Misleading Filing by HF Foods Responding to the Report**

103.    On March 25, 2020, Zhou Min Ni, as Co-CEO of HF Foods, signed an interim report on a Form 8-K that denied the "derogatory assertions" made in the Report and represented that "[HF Foods's] published financial statements and other public disclosures fairly present, in all material respects, the financial condition and results of operations of the Company, as well as [its] subsidiaries, [its] dealings with related parties, and the compensation of the Company's executive officers." This was materially false and misleading because Zhou Min Ni was aware that many of the allegations made in the Report were true, such as the allegation relating to the luxury vehicles and the allegation relating to UGO, which the company later essentially acknowledged by issuing corrective restatements. Nonetheless, Zhou Min Ni continued to assert publicly that HF Foods's financials could be relied upon.

104.    HF Foods appointed a Special Investigation Committee of Independent Directors ("SIC") in response to the allegations in the Report. In February 2021, Zhou Min Ni resigned from his positions at HF Foods.

**J.      HF Foods Restates Its Earnings and Acknowledges Material Misstatements**

105.    On January 20, 2023, HF Foods filed a Form 8-K publicly disclosing that its financial statements for the quarters and full years 2019, 2020 and 2021 should not be relied upon due to errors related to, among other things, related party transactions.

106.    On January 31, 2023, HF Foods filed a Form 10-K for the year 2021. In this document, HF Foods restated its financial statements from 2019 and 2020 and certain 2018 financial information and provided a public update as to the investigation that had been conducted by the SIC. *See supra*, ¶ 9. Specifically, the SIC found:

   a.    Members of Zhou Min Ni's family received undisclosed compensation from transactions with related parties that had been excluded from previously filed proxy statements;

   b.    Certain advances made by HF Foods to Revolution Industry, in particular, payments for luxury cars, "did not occur in the normal course of business" and "should be accounted as compensation expense" because Revolution Industry and Revolution Automotive "were used to obtain funds which paid for luxury cars for the benefit of the Ni family";

   c.    Feilong was not a supplier to the company; there was no evidence that funds were ever provided to Feilong; the notes receivable were not provided in the ordinary course of business; and the notes receivable appeared to have benefited Zhou Min Ni.

d.      The "marketing services" provided by UGO were not "commensurate to the amounts paid" to UGO from 2018–2021.

107.    When asked by SEC counsel during investigative testimony about the fraudulent schemes, misleading statements, and material omissions described *supra*, ¶¶ 1–104, relating to Revolution Industry, Feilong, and UGO, Zhou Min Ni asserted his Fifth Amendment right against self-incrimination.

108.    On September 30, 2019, Zhou Min Ni received loan rights, valued at $12,038,030, in exchange for 1,203,803 shares of HF Foods stock that Zhou Min Ni had received at the time of de-SPAC transaction in August 2018. The prices of those shares was inflated at the time as a result of Zhou Min Ni's material misstatements and omissions. By tendering this stock to HF Foods in September 2019, Zhou Min Ni obtained money or property by means of his material misstatements and omissions.

### K.      **This Action Is Timely Filed**

109.    Zhou Min Ni entered into an initial tolling agreement with the SEC in which he agreed to toll for ninety days any statute of limitations applicable to the conduct and claims alleged herein. This first tolling agreement covers the period beginning on February 15, 2023, through May 16, 2023. Zhou Min Ni then entered into a second tolling agreement covering the period beginning on May 16, 2023, through August 14, 2023. Zhou Min Ni entered into a third tolling agreement covering the period beginning on August 14, 2023, through November 12, 2023. Zhou Min Ni entered into a fourth tolling agreement covering the period beginning on November 12, 2023, through December 24, 2023. Zhou Min Ni entered into a fifth tolling agreement covering the period beginning on December 24, 2023, through January 23, 2024. Zhou Min Ni entered into a sixth tolling agreement covering the period beginning on January 23, 2024, through February 29, 2024. Zhou Min Ni entered into a seventh tolling agreement

covering the period beginning on February 29, 2024, through April 8, 2024. Zhou Min Ni

entered into an eighth tolling agreement covering the period beginning on April 9, 2024, through

May 10, 2024. Zhou Min Ni entered into a ninth tolling agreement covering the period beginning

on May 10, 2024, through June 7, 2024.

110.    Jonathan Ni entered into an initial tolling agreement with the SEC in which he

agreed to toll for ninety days any statute of limitations applicable to the conduct and claims

alleged herein. This first tolling agreement covers the period beginning on April 28, 2023,

through July 26, 2023. Jonathan Ni then entered into a second tolling agreement covering the

period beginning on August 19, 2023, through November 17, 2023. Jonathan Ni entered into a

third tolling agreement covering the period beginning on November 17, 2023, through December

17, 2023. Jonathan Ni entered into a fourth tolling agreement covering the period beginning on

December 17, 2023, through January 16, 2024. Jonathan Ni entered into a fifth tolling agreement

covering the period beginning on January 16, 2024, through February 29, 2024. Jonathan Ni

entered into a sixth tolling agreement covering the period beginning on February 29, 2024,

through April 8, 2024. Jonathan Ni entered into a seventh tolling agreement covering the period

beginning on April 8, 2024, through May 10, 2024. Jonathan Ni entered into an eighth tolling

agreement covering the period beginning on May 10, 2024, through June 7, 2024.

## FIRST CLAIM FOR RELIEF
(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)
(Zhou Min Ni and Jonathan Ni)

111.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully

set forth herein.

112.    By engaging in the conduct described above, Zhou Min Ni, Jonathan Ni, and HF

Foods, in connection with the purchase or sale of a security, by the use of means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

113.    While engaging in the conduct described above, Zhou Min Ni, Jonathan Ni, and HF Foods acted knowingly or recklessly.

114.    By engaging in the conduct described above, Zhou Min Ni and Jonathan Ni violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
(Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act)
(Zhou Min Ni and Jonathan Ni)

115.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

116.    By engaging in the conduct described above, Zhou Min Ni and Jonathan Ni, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud; and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

117.    By engaging in the conduct described above, Zhou Min Ni and Jonathan Ni violated, and unless restrained and enjoined will again violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)].

### THIRD CLAIM FOR RELIEF
(Violations of Section 17(a)(2) of the Securities Act)
(Zhou Min Ni)

118.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

119.    As part of the August 2018 de-SPAC transaction, Zhou Min Ni obtained 6,689,896 shares of HF Foods stock. On September 30, 2019, Zhou Min Ni received loan rights from HF Foods valued at $12,038,030 in exchange for 1,203,803 of his shares. At the time, the value of the shares Zhou Min Ni turned over was inflated as a result of his misrepresentations.

120.    By reason of the conduct described above, Zhou Min Ni, in the offer or sale of a security, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    By engaging in the conduct described above, Zhou Min Ni violated, and unless restrained and enjoined will again violate, Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

### FOURTH CLAIM FOR RELIEF
(Violations of Exchange Act Rule 13b2-2)
(Zhou Min Ni and Jonathan Ni)

122.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

123.    By reason of the conduct described above, Zhou Min Ni and Jonathan Ni, while acting as officers of HF Foods, (i) made or caused to be made material false or misleading statements to an accountant; or (ii) omitted to state, or caused another person to omit to state,

material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) any audit, review or examination of the financial statements of the issuer required by the Exchange Act or rules thereunder; or (2) the preparation or filing of any document or report required to be filed with the SEC pursuant to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], or otherwise.

124.    By engaging in the conduct described above, Zhou Min Ni and Jonathan Ni violated, and unless restrained and enjoined, will continue to violate Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

**FIFTH CLAIM FOR RELIEF**
(Violations of Exchange Act Rule 13a-14)
(Zhou Min Ni and Jonathan Ni)

125.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

126.    Zhou Min Ni, as the Chief Executive Officer of HF Foods, and Jonathan Ni, as the Chief Financial Officer of HF Foods, falsely certified (1) that there were no untrue statements or omissions of material facts necessary to make the statements not misleading in light of the circumstances in which they were made in HF Foods's periodic reports filed with the Commission; (2) that those reports fairly presented in all material respects the financial condition and results of the operations of HF Foods; (3) that they were responsible for establishing and maintaining disclosure controls and internal control for financial reporting ("ICFR"), and that they had done so; and (4) that they had disclosed to HF Foods's auditors and the Board of Directors deficiencies and material weaknesses and any fraud involving those with an ICFR role.

127.    When they signed these certifications, Zhou Min Ni and Jonathan Ni acted knowingly or negligently.

128.    By engaging in the conduct described above, Zhou Min Ni and Jonathan Ni violated, and unless restrained and enjoined, will again violate, Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

### SIXTH CLAIM FOR RELIEF
(Violations of Exchange Act Rule 13a-15(b))
(Zhou Min Ni and Jonathan Ni)

129.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

130.    Zhou Min Ni and Jonathan Ni, while acting as Chief Executive Officer and Chief Financial Officer for HF Foods, respectively, were required to evaluate the effectiveness of HF Foods's disclosure controls and procedures at the end of each fiscal quarter.

131.    Zhou Min Ni and Jonathan Ni failed to evaluate HF Foods's disclosure controls and procedures, as they were required to do. Zhou Min Ni and Jonathan Ni thereby violated, and unless restrained and enjoined, will again violate, Rule 13a-15(b) of the Exchange Act [17 C.F.R. § 240.13a-15(b)].

### SEVENTH CLAIM FOR RELIEF
(Violations of Exchange Act Rule 13a-15(c))
(Zhou Min Ni and Jonathan Ni)

132.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

133.    Zhou Min Ni and Jonathan Ni, while acting as Chief Executive Officer and Chief Financial Officer for HF Foods, respectively, were required to evaluate the effectiveness of HF Foods's internal controls over financial reporting as of the end of each fiscal year.

134.    Zhou Min Ni and Jonathan Ni failed to evaluate HF Foods's internal controls over financial reporting, as they were required to do. Zhou Min Ni and Jonathan Ni thereby violated,

and unless restrained and enjoined, will again violate, Rule 13a-15(c) of the Exchange Act [17 C.F.R. § 240.13a-15(c)].

### EIGHTH CLAIM FOR RELIEF
(Aiding and Abetting HF Foods's Violations of Exchange Act Section 13(a),
and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder)
(Zhou Min Ni)

135.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

136.    HF Foods violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] by reason of Zhou Min Ni's and Jonathan Ni's conduct described above and by making false statements and misleading omissions of material fact in its filings with the Commission.

137.    Zhou Min Ni knowingly or recklessly provided substantial assistance that aided and abetted HF Foods's violations.

138.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Zhou Min Ni is liable for those violations.

### NINTH CLAIM FOR RELIEF
(Aiding and Abetting HF Foods's Violations of Exchange Act Section 13(a),
and Rules 12b-20, 13a-1, and 13a-13 Thereunder)
(Jonathan Ni)

139.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

140.    HF Foods violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] by reason of Zhou Min Ni's and Jonathan Ni's conduct described above and by making false statements and misleading omissions of material fact in its filings with the Commission.

141.    Jonathan Ni knowingly or recklessly provided substantial assistance that aided and abetted HF Foods's violations.

142.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Jonathan Ni is liable for those violations.

### TENTH CLAIM FOR RELIEF
(Aiding and Abetting HF Foods's Violations of
Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B))
(Zhou Min Ni and Jonathan Ni)

143.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

144.    HF Foods failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Further, HF Foods failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets. Finally, HF Foods failed to compare the recorded accountability for assets with the existing assets at reasonable intervals and failed to take appropriate action with respect to any differences.

145.    HF violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A) and (b)(2)(B)].

146.    Zhou Min Ni and Jonathan Ni knowingly or recklessly provided substantial assistance that aided and abetted HF Foods's violation of Sections 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.

147.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Zhou Min Ni and Jonathan Ni are liable for those violations.

### ELEVENTH CLAIM FOR RELIEF
(Violations of Exchange Act Sections 14(a) and Rule 14a-9 Thereunder)
(Zhou Min Ni)

148.     Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

149.     HF Foods filed proxy statements in 2019 and 2020 that contained material misstatements regarding the executive compensation of Zhou Min Ni, and falsely asserted that the Board of Directors had analyzed the prices paid to HF Foods's related parties, including Revolution Industry and UGO. In doing so, HF Foods directly or indirectly violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

150.     As Chairman of HF Foods's Board of Directors, and a nominee for whose election as director the proxies were solicited, Zhou Min Ni solicited the 2019 and 2020 proxies. Zhou Min Ni thereby violated, and unless restrained and enjoined, will again violate, Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

### TWELFTH CLAIM FOR RELIEF
(Aiding and Abetting Atlantic Acquisition Corp.'s Violation of
Exchange Act Sections 14(a) and Rule 14a-9 Thereunder)
(Zhou Min Ni and Jonathan Ni)

151.     Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

152.     Atlantic Acquisition Corp., by making the proxy filings set forth above, directly or indirectly violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9]. Zhou Min Ni and Jonathan Ni knowingly or recklessly

provided substantial assistance that aided and abetted Atlantic Acquisition Corp.'s violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

153.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Zhou Min Ni and Jonathan Ni are liable for those violations.

### THIRTEENTH CLAIM FOR RELIEF
(Aiding and Abetting HF Foods's Violations of Exchange Act Rule 13a-15(a))
(Zhou Min Ni)

154.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

155.    HF Foods had a class of securities registered pursuant to section 12 of the Exchange Act. HF Foods nonetheless failed to maintain appropriate disclosure controls and procedures, as defined in Exchange Act Rule 13a-15(e) [17 C.F.R. § 240.13a-15(e)]. HF Foods also was required to file an annual report pursuant to 15 U.S.C. §§ 78m(a) or 78o(d) but nonetheless failed to maintain internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f) [17 C.F.R. § 240.13a-15(f)].

156.    By engaging in the conduct described above, HF Foods violated Rule 13a-15(a) of the Exchange Act. [17 C.F.R. § 240.13a-15(a)]

157.    Zhou Min Ni knowingly or recklessly provided substantial assistance that aided and abetted HF Foods's violation of Rule 13a-15(a) of the Exchange Act.

158.    Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Zhou Min Ni is liable for those violations.

### FOURTEENTH CLAIM FOR RELIEF
(Violations of Sarbanes-Oxley Act Section 304)
(Zhou Min Ni)

159.    Paragraphs 1 through 110 are realleged and incorporated by reference as if fully set forth herein.

44

160.    Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243] requires the CEO of an issuer to reimburse that issuer, if it is required to prepare an accounting restatement due to the material noncompliance of the issuer with any financial reporting requirement under the securities laws as a result of misconduct, for (a) any bonus or other incentive-based or equity-based compensation received by the CEO from the issuer during the 12-month period following each false filing, and (b) any profits realized from the CEO's sale of securities of the issuer during each such 12-month period.

161.    Zhou Min Ni has not reimbursed HF Foods for any portion of the bonuses, incentive-based compensation, equity-based compensation, or profits from his sales of HF Foods securities that he received during the 12-month periods following each filing of the financial statements restated by HF Foods. Specifically, Zhou Min Ni received loan rights from HF Foods on September 30, 2019, valued at $12,038,030, in exchange for 1,203,803 shares of HF Foods stock. Zhou Min Ni thereby obtained profits from the sale of HF Foods securities, whose value at the time was inflated as a result of his material misstatements and omissions.

162.    By reason of the foregoing, Zhou Min Ni violated Sarbanes-Oxley Act Section 304.

## PRAYER FOR RELIEF

WHEREFORE, the Securities and Exchange Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that Defendants Zhou Min Ni and Jonathan Ni violated the federal securities laws alleged in the Complaint.

II.

Permanently enjoining Defendants Zhou Min Ni and Jonathan Ni and all persons in active
concert or participation with them, from violating the federal securities laws alleged in this
Complaint.

III.

Enjoining Defendant Zhou Min Ni, pursuant to Section 20(b) of the Securities Act [15 U.S.C.
§77t(b)] and Section 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(5)],
from directly or indirectly participating in the management of, or otherwise exercising any
control or influence over, HF Foods Group Inc. and any of its successors, including, but not
limited to, the governance thereof; provided, however, that this injunction shall not prevent Zhou
Min Ni from voting, purchasing, or selling shares of HF Foods Group Inc. or its successors on
his own behalf.

IV.

Ordering Defendants Zhou Min Ni and Jonathan Ni to pay civil monetary penalties pursuant to
Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange
Act [15 U.S.C. § 78u(d)(3)].

V.

Ordering Defendant Zhou Min Ni to disgorge any ill-gotten gains and to pay prejudgment
interest thereon. See Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§
78u(d)(3), (d)(5) and (d)(7)].

VI.

Ordering that Defendant Zhou Min Ni be barred from acting as officer or director of any public
company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2)
of the Exchange Act [15 U.S.C. § 78u(d)(2)], and that Defendant Jonathan Ni be barred from

acting as officer or director of any public company pursuant to Section 21(d)(2) of the Exchange

Act [15 U.S.C. § 78u(d)(2)].

VII.

Ordering Defendant Zhou Min Ni to reimburse HF Foods as required by Section 304 of the

Sarbanes-Oxley Act [15 U.S.C. § 7243].

VIII.

Granting such other and further equitable relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands

trial by jury.

Dated: Washington, D.C.         By:
     June 3, 2024            John B. Timmer (DC Bar No. 997309)
                                       Brian S. Kang (DC Bar No. 1618035)
                                       *Attorneys for Plaintiff*
                                       Securities and Exchange Commission
                                       100 F Street, N.E.
                                       Washington, D.C. 20549
                                       (202) 551-7687 (Timmer)
                                       Email: timmerj@sec.gov
                                       (202) 551-7690 (Kang)
                                       Email: kangb@sec.gov